**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 2:19-cr-00003-DBH |
| | ) | |
| MEKONNEN BERHE | ) | |
| | ) | |
| Defendant | ) | |

**MOTION TO SUPPRESS**
**WITH INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Now comes the Defendant, MeKonnen Berhe, by and through the undersigned counsel and moves for the suppression and exclusion of all evidence, physical and testimonial, obtained or derived from or through or as a result of law enforcement's unlawful search and seizure.

## I.   Background

The Defendant is charged in a one (1) count indictment with possession with Intent to Distribute Cocaine Base in violation of 21 U.S.C. § 841(a)(1). The charges stem from a traffic stop conducted by Sergeant Thomas Pappas of the South Portland, Maine, police department on September 2, 2018, and the subsequent seizure of approximately 17 grams of crack cocaine.

## II.   Relevant Facts[1]

On September, 2, 2018, at approximately 11:30 p.m., Sergeant Thomas Pappas was stopped at a red light in South Portland, Maine. He asserts that he saw a vehicle make a right hand turn without coming to a stop at the red light.[2] Sergeant Pappas turned to follow the vehicle and activated

---

[1] The facts stated herein are derived from the Government-provided discovery to date, including a written report from Sergeant Pappas and a video recorded by the dashboard camera of Sergeant Pappas's police cruiser.
[2] The alleged traffic violation is not recorded on video.

his cruiser lights and alarm to effectuate a vehicle stop. The vehicle promptly came to a safe stop on the right-hand side of the road.

Sergeant Pappas stepped from his cruiser and approached the stopped vehicle. He was dressed in uniform with his gun holstered at his side. He informed the occupants that he stopped them for failing to stop at a red light, and also claimed that after he initiated the stop he noticed inoperable rear license plate lights. The vehicle had two occupants—the driver and Defendant MeKonnen Berhe, who was seated in the front passenger seat. Both the driver and Mr. Berhe are black. The men were polite and friendly to Sergeant Pappas when he approached them. Sergeant Pappas leaned in through the passenger side window and asked the men to produce their identification ("ID"). Both occupants notified him that they did not have any IDs with them. The driver stated the vehicle belonged to a friend and produced a sale certificate for the vehicle, registered to a female individual. Upon Sergeant Pappas's instruction, the driver wrote his name and Ohio driver's license number down for Sergeant Pappas.

Sergeant Pappas then turned to the passenger, Mr. Berhe, and ordered him to write his name and date of birth down. Mr. Berhe told him, firmly but politely, "I don't have to give you my name." Sergeant Pappas said "Yeah, I realize that." But then instructed him for his name and date of birth again. Mr. Berhe again politely said "No." Sergeant Pappas then asked if anyone was on probation. Both men were not on probation and so stated "No." Then, for the first time, over two minutes after he had first approached the vehicle, Sergeant Pappas claimed that he smelled burning marijuana, "somebody was also smoking weed in the car." Both the driver and Mr. Berhe stated they didn't smell any weed and that they don't smoke weed, or "dope." Sergeant Pappas insisted he smelled weed and someone was smoking. He then told Mr. Berhe that, because of this, Mr. Berhe now had to give Sergeant Pappas his name: "I need your name for that." Before the men could even respond, Sergeant Pappas ordered "I need your name for that. I'm letting you know right now.

2

Don't give me a hard time. I need your name for that," even though both men had been nothing but cooperative and polite. Sergeant Pappas demanded identification from Mr. Berhe again. Mr. Berhe clarified that Sergeant Pappas wanted his birthdate written down as well as his name, and then wrote both down.

Sergeant Pappas then demanded that Mr. Berhe identify the "bulge" in his left front pants pocket and ordered him to pull it out to show Sergeant Pappas. Mr. Berhe politely complied, pulling out cash. Sergeant Pappas then asked "anything else in that pocket? You don't have ID on you?" Mr. Berhe said he had nothing else in his pockets. He had an iPhone on his lap. Sergeant Pappas then stated "just two phones" in apparent reference to the phone on Mr. Berhe's lap and another phone in the vehicle on the bottom of the dashboard.  Mr. Berhe told Sergeant Pappas the phone below the dashboard was for music.

At that point, Sergeant Pappas demanded that Mr. Berhe, but not the driver, leave the vehicle. Again, Mr. Berhe politely complied with this order. Sergeant Pappas demanded to know if Mr. Berhe had anything else in his pockets besides money, and ordered Mr. Berhe to pull everything out. "Just search me," Mr. Berhe acquiesced. Sergeant Pappas stated, "No, I don't want to search you." He again ordered Mr. Berhe to pull everything out of his pockets. Mr. Berhe continued to be polite and fully complaint. He reached into his pockets and pulled each one inside out as ordered, finding his ID buried inside one and handing it over.

Sergeant Pappas asked Mr. Berhe again if he was on probation.  Mr. Berhe confirmed was not on probation and informed Sergeant Pappas that he was "on bail." Mr. Berhe then accurately informed the Sergeant that he was on bail for "trespassing and VCR." Sergeant Pappas then placed Mr. Berhe at the side of his cruiser and told him to put his hands on the hood on side of the cruiser (outside of the view of the cruiser dashboard camera.) Mr. Berhe complied as ordered. Sergeant Pappas then went inside his cruiser, apparently to run Mr. Berhe's name and date of birth through a

3

computer database. This took at least five minutes. Mr. Berhe did not move from the side of the cruiser.

After the more than 5 minute had passed, Sergeant Pappas got out of his cruiser exclaiming "you have three sets of bail conditions."  Sergeant Pappas strode toward Mr. Berhe, exclaiming "You are not under arrest. Put your hands behind your back." He handcuffed Mr. Berhe, and told him that he was being detained. Then Sergeant Pappas began to physically search Mr. Berhe. He did not begin at the top or the bottom of Mr. Berhe's body. Instead, he pushed Mr. Berhe forcefully up against the cruiser, so Mr. Berhe's stomach and chest was smashed against the cruiser itself. Then Sergeant Pappas jammed his hand in between Mr. Berhe's buttocks and forcefully scraped his hand all the way down Mr. Berhe's buttock checks, forcefully separating the cheeks from top to bottom, scraping his fingers all the way across his anus, outside of his clothing. Sergeant Pappas ran his hands all the way down Mr. Berhe's buttock crack and around Mr. Berhe's anus to Mr. Berhe's testicles, which he then squeezed. In extreme discomfort, Mr. Berhe exclaimed "that's my balls." Sergeant Pappas started pushing Mr. Berhe—who was in handcuffs against the cruiser—to the front of the cruiser, ordering him to "Come here. Come here." Sergeant Pappas squeezed Mr. Berhe's testicles with one hand, never letter go, the whole time he pushed Mr. Berhe to the front of the cruiser.

Uncomfortable, Mr. Berhe reflexively began to squirm slightly. Sergeant Pappas continuously told him to stop moving, even during times when he was not. Sergeant Pappas began to manipulate something from Mr. Berhe's groin area up through his thigh, pants leg, the waistband of his boxer briefs and, finally, to the waistband of his pants. Mr. Berhe repeatedly asked Sergeant Pappas not to touch his "balls" (testicles). Sergeant Pappas told Mr. Berhe not to "get dumb" with him. Mr. Berhe again asked him not to touch his "balls." To which Sergeant Pappas replied "nobody's touching your balls." After taking nearly a full minute to manipulate an object to the

outside of Mr. Berhe's waistline, Sergeant Pappas removed an object later identified as a baggie containing crack cocaine. After Sergeant Pappas found the crack, Mr. Berhe began to run away, still in hand-cuffs. He was recovered shortly thereafter by Sergeant Pappas.

## III.   Argument Summary

The search the police conducted on September 2, 2018, violated the Fourth Amendment of the U.S. Constitution.  That evidence attained from that illegal search is the non-attenuated fruit of the search and must be suppressed and excluded. The police had no probable cause to search Mr. Berhe, and no warrant; nothing that transpired between the motor vehicle stop and the ultimate search of Mr. Berhe's person while detained in handcuffs lessened those burdens. The Sergeant who conducted the search had no reasonable articulable suspicion to remove Mr. Berhe from the vehicle, and discovered nothing after removing him from the vehicle to give him reasonable articulable suspicion or probable cause to conduct the invasive search of Mr. Berhe while he was handcuffed. The Government cannot rely upon *Terry* as a basis for the removal as law enforcement had no reasonable articulable suspicion that criminal activity was afoot or that law enforcement was in danger. The Government cannot rely upon *Terry* as a basis for the search because law enforcement had no fear of danger or fear that Mr. Berhe possessed a weapon, Mr. Berhe was handcuffed and detained during the search, and the search conducted went well beyond the parameters of the protective "pat-down" allowed in *Terry*. The Government cannot rely on bail conditions the State of Maine had imposed upon Mr. Berhe for the search, as those pre-trial bail conditions were discovered after Mr. Berhe was unlawfully removed from the car and because pre-trial bail conditions that purport to allow an individual to be searched without either reasonable suspicion or probable cause are unconstitutional. As such, the search of Mr. Berhe was unconstitutional and the evidence obtained from that illegal search must be suppressed.

**IV.     The Government Violated the Fourth Amendment When it Searched Mr. Berhe Without a Warrant**

A traffic stop and detention of a vehicle's occupants is a seizure under the Fourth Amendment. *United States v. Jones*, 700 F.3d 615, 621-22 (1st Cir. 2012) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. As the text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006). "Time and again, this Court has observed that searches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19-20 (1984)) (listing cases). A properly-issued warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14 (1948). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King,* 131 S. Ct. 1849, 1856–57 (2011). No warrant was obtained here and no exceptions apply; for this reason, the Court must suppress all evidence obtained as a result of the September 2, 2018 stop and seizure.

**A.     The Initial Stop Was Invalid**

The stop of the vehicle was illegal from its inception. An automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). Although the decision to stop a vehicle is generally reasonable

6

where the police have probable cause to believe that a traffic violation has occurred, *Whren v. United States*, 517 U.S. 806, 810 (1996), a stop is constitutionally unreasonable if the officer does not have "reasonable, articulable suspicion that criminal activity is afoot," *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *see also Navarette v. California*, 134 S. Ct. 1683, 1687 (2014). A motorist or passenger "may not be detained even momentarily without reasonable, objective grounds for doing so. . . ." *Florida v. Royer*, 460 U.S. 491, 498 (1983). *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (Fourth Amendment permits "brief investigative stops," including traffic stops, when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

The traffic stop in this case was not based on reasonable suspicion because Sergeant Pappas had decided to stop the vehicle before any grounds for suspicion arose. There is no evidence the driver of the car ran a red light. The alleged moving violation– a minor traffic infraction – was pretext for stopping a car close to midnight with two black men inside to conduct an evidentiary search.

### i. Berhe Has Standing to Challenge the Stop and Move to Suppress the Fruits of His Illegal Detention

"The fact that a defendant is a passenger in a vehicle as opposed to the driver is a distinction of no consequence in this context." *United States v. Kimball*, 25 F.3d 1, 5-6 n.3 (1st Cir. 1994); *see also Brendlin v. California*, 551 U.S. 249, 251 (2007) (holding that a passenger in a car is seized along with the driver when the car is stopped by the police and has standing to challenge the constitutionality of the stop); *United States v. Starks*, 769 F.3d 83 (1st Cir 2014) (confirming that a passenger has standing to challenge the constitutionality of a seizure resulting from a traffic stop); *United States v. Mosley*, 454 F.3d 249, 262-69 (3d Cir. 2006) (suppressing evidence against the driver and the passenger of a car who were unlawfully detained after the legitimate purpose of stop was completed because the driver's consent was not sufficiently attenuated from the illegal detention to be purged), abrogated

7

on other grounds by *United States v. Pack*, 612 F.3d 341 (5th Cir. 2010). As the passenger in the stopped vehicle, Mr. Berhe has standing to challenge both the stop and the constitutionality of the search following the stop.

> **B.** **Sergeant Pappas Lacked Reasonable Suspicion to Remove Berhe From the Vehicle; This Seizure was Illegal**

Even if the vehicle stop was justified, Pappas's detention of Berhe was not. The key in determining if a seizure has occurred within the meaning of the Fourth Amendment is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citation omitted).

Because a traffic stop is analogous to a *Terry* stop, *e.g.* a "relatively brief encounter," "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission – to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (collecting cases); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Rodriguez,* 135 S.Ct. at 1614 (internal quotations omitted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.* at 1614.

Of course, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop.'" *Id.* (internal quotations omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615.   An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

Berhe was "seized" within the meaning of the Fourth Amendment when Pappas ordered him out of the car. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Pappas lacked reasonable articulable suspicion to remove Mr. Berhe from the vehicle because Pappas lacked particularized reasonable suspicion that Berhe was carrying a weapon or criminal activity was occurring. At this point, Pappas had clearly viewed the vehicle and nothing in the vehicle or its occupants suggested either occupant was armed or dangerous, or engaging in criminal activity. Some cash, an iPhone, and a phone for music on the dashboard (with no evidence it belonged to Berhe), did not generate reasonable suspicion. Furthermore, Berhe had not acted in a suspicious manner, and when he emptied his pockets upon demand; none of the contents suggested he was armed, dangerous, carrying contraband, or engaged in criminal activity.

The smell of marijuana does not impact the calculus here. Prior to ordering Berhe out of the car, Pappas alleged he smelled burnt marijuana. This does not create reasonable suspicion of criminal activity on the driver's part, let alone Berhe's. There was no contraband in plain sight in the car. Furthermore, the smell of *burning* marijuana does not even constitute reasonable suspicion or probable to believe contraband is in the vehicle, let alone constitute cause to seize and then search the vehicle's *occupants*. To establish probable cause to search a vehicle's passenger, some link between the passenger and the crime must exist, or probable cause will not be found. Here, there is no such evidence and the mere alleged smell of burning marijuana in a vehicle does not justify extending the seizure beyond a *Terry* vehicle stop and permit a non-weapons-related search of the vehicle's passenger, Mr. Berhe.

Anything following the illegal order to exit the vehicle was illegal and evidence found thereafter must be suppressed. Nothing beyond this point, changed that situation and any fruits

obtained from the search must be suppressed.[3] Mr. Berhe continued to comply with Sergeant

Pappas's orders, emptying his pockets one by one with nothing incriminating or dangerous therein.

### C.   The Search Impermissibly Exceeded the Bounds Of *Terry* and a Required a Warrant

A *Terry*-type pat search is permissible only when "an officer is justified in believing that the

individual whose suspicious behavior he is investigating at close range is armed and presently

dangerous to the officers and others." *Terry v. Ohio*, 392 U.S. 1, 24 (1968). A pat search for

contraband is never permissible, unless a pat search *for weapons* reveals an object that is plainly

incriminating. *Adams v. Williams,* 407 U.S. 143, 146 (1972) (emphasis added) ("The purpose of this

limited search is not to discovery evidence of crime, but to allow the officer to pursue his

investigation without fear of violence. . . ."); *Sibron v. New York*, 392 U.S. 40, 65-66 (1968) (If the

protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer

valid under *Terry* and its fruits will be suppressed.); *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993)

(an officer may seize contraband during the course of an otherwise lawful pat down search only if

the object's "contour or mass makes its identity immediately apparent").

---

[3] To the extent the Government will attempt to argue, as it did in the criminal complaint, that Mr. Berhe consented to Sergeant Pappas' search, the facts demonstrate this is not the case. Although Mr. Berhe grumbled "just search me" in acquiescence to Sergeant Pappas, it is apparent this was his acquiescence to Sergeant Pappas's show of authority and order to leave the vehicle, not consent to a search. It is plain that no reasonable person in Berhe's position would not have believed he was free to go when ordered by Pappas, an armed and uniformed police officer fully vested with the official authority of the state, to step out of the car. Pappas had already told the two men "Don't give me a hard time" in response to polite and cooperative behavior by both men, including Mr. Berhe who had reasonably believed he was not required to give him his name. Sergeant Pappas had ordered Mr. Berhe to expose the contents of his pocket in the car. Immediately upon exiting the vehicle, Sergeant Pappas continued his orders, inquiring further as to the contacts of his pockets. Even Sergeant Pappas understood that Mr. Berhe's comment did not constitute consent to search his person, as he did not search him at that time—further evidence that Mr. Berhe's comment did not constitute consent. While an officers' subjective knowledge is not relevant, *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004) (arresting officer's "subjective intent is always determined by objective means"), the law enforcement officer's behavior is probative to the analysis that no objective particularized facts existed to create probable cause and exigency to allow a search.

A *Terry*-type search, or protective search, is the only search permitted without a warrant and on the basis of reasonable suspicion and not probable cause. Any "pat-downs" must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry,* 392 U.S.  at 26; *see also Michigan v. Long,* 463 U.S. 1032, 1049, and 1052, n. 16 (1983); *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979) ("Nothing in *Terry* can be understood to allow . . . any search whatever for anything but weapons").. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. . . ." *Adams,* 407 U.S. at 146.  At this point, Fourth Amendment jurisprudence is clear: "[O]nce an officer has determined that the object is not a weapon and its shape or size does not indicate its contraband nature, the search must stop," *United States v. Works*, 338 F. App'x 295, 299 (4th Cir. 2009), or the frisk becomes a search, which must be supported by probable cause. If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed. *Sibron v. New York,* 392 U.S. 40, 65–66 (1968).

Here, the Government searched Mr. Berhe in what was demonstrably a search beyond the parameters of *Terry*. Government cannot demonstrate any basis from which to conclude that the Defendant might have been armed or dangerous, and there was no initial pat frisk[4] that uncovered an object that is plainly incriminating. The search of Mr. Berhe after he was handcuffed went well beyond the parameters of an allowable *Terry*-type pat-down. There was no reasonable suspicion, let alone probable cause, for Pappas to suppose that Berhe was carrying drugs in his underwear. Nothing suggested a weapon in Mr. Berhe's clothing. Sergeant Pappas is not able to conduct a full scale search on Mr. Berhe and then simply manipulate whatever objects he feels into view and then post-hoc justify his search. Sergeant Pappas unconstitutionally extended the seizure – without any

---

[4] The search of Mr. Berhe while handcuffed was not a "pat" frisk allowed under *Terry*.

justification or exigent circumstances – when he forced Mr. Berhe to submit to a handcuffed and invasive search of his body.

### i. Neither the Smell of Burning Marijuana, Nor Any Other Facts Created Probable Cause to Justify the Search of Mr. Berhe.

Officer Pappas alleges it smelled like "someone was smoking weed" and "burning" marijuana while he had the vehicle stopped and was questioning the driver and passenger.[5] The smell of burnt marijuana, however, does not create probable cause to search Mr. Berhe.  There is no obvious correlation between marijuana possession and/or smoking, and the possession of any weapons or probable cause of any other crime. Plus, the "burning" nature of the marijuana Sergeant Pappas stated he smelled does not correlate with any basis to believe that un-burnt marijuana might be present in the car, let alone on the person of the car *passenger* – or that it might be present in sufficient quantity to justify a crime, or that defendant was not authorized to possess marijuana for medicinal purposes, etc. – is nothing more than rank speculation. *Cf. Commonwealth v. Cruz*, 459 Mass. 459, 476 (2011) (the odor of burnt marijuana does not support probable cause to believe that a criminal amount of contraband was in the car); *Commonwealth v. Overmyer*, 469 Mass. 16 (2014) (the odor of unburnt marijuana "points only to the presence of *some* marijuana, not necessarily a criminal amount.") (emphasis in original). There is no obvious correlation between marijuana possession and/or smoking, and the possession of weapons or other criminal activity, especially when considered against the backdrop of facts presented here.  Nor does the suspected possession of marijuana, 22 M.R.S. § 2383(1)(A) – enforceable only by the issuance of a civil summons, 17-A M.R.S. § 17(1) – give rise to an inference of dangerousness or criminal activity.

---

[5] Notably, Sergeant Pappas did state anything about marijuana or weed when he began speaking with the occupants of the vehicle. He did not claim to smell "someone smoking weed" until passenger Berge stated he was within his rights not have to provide his name to the Sergeant. Only then, over *two minutes* after Sergeant Pappas initially approached the car and only after Mr. Berhe exercised his rights not to provide his name, did Sergeant Pappas claim he smelled someone "smoking weed."

The additional alleged presence of cash in the defendant's pocket and the two cellular telephones—one underneath the dashboard used for music—does not in any way alter this analysis. There is simply no correlation to an individual having cash and an extra cell phone for music[6]—a relatively common practice in today's society—to create probable cause (and exigent circumstances) to justify a warrantless search of a person.

### ii. Berhe's Pre-Trial Bail Conditions Are Unconstitutional and Did Not Provide Cause for a Search[7]

Mr. Berhe's pretrial bail conditions—supposedly authorizing a search of his person *without* probable cause or reasonable suspicion were patently unconstitutional, and did not justify the search. At the time he was searched, Mr. Berhe had been released on a pending charge prior to this incident. He was therefore innocent of that alleged unrelated crime unless and until he was convicted of that crime. Persons released on bail are presumed innocent. Neither the fact of their arrest, nor the fact that they "acquiesced" (under the threat of lost liberty) to a random search condition imposed upon them in order to avoid incarceration, renders the search constitutional. This is true even for persons who have a history of drug and alcohol abuse and/or a history of failing to appear in court. Every citizen who has not yet been convicted of a crime is entitled to protection from warrantless searches of his or her home, property or person absent probable cause and exigent circumstances (or the other carefully limited exceptions to the warrant requirement recognized by the U.S. Supreme Court, none of which apply here.)[8]

---

[6] There is no evidence the cell phone underneath the dashboard of the car belonged to the defendant who was a passenger in the car.

[7] Although the Defendant continues his argument regarding further illegalities with the stop, in so doing he does not waive any prior arguments on the initial illegalities that, in and of themselves, warrant suppression.

[8] As explained above, Mr. Berhe never consented to any search. The Defendant does expect the Government will argue that Sergeant Pappas's search of Mr. Berhe while he had Mr. Berhe detained and in handcuffs was "consensual." However, assuming *arguendo* only that prior consent was given, Mr. Berhe clearly and repeatedly revoked any such consent—and certainly limited the scope of consent—during the search of his person, including his buttocks, anus region and testicles, while handcuffed and while he repeatedly asked the Sergeant to stop touching him and his testicles.

Recent Supreme Court decisions demonstrate that the Court is concerned about the nature and extent of the Fourth Amendment protections afforded to arrestees. In *Maryland v. King*, 133 S. Ct. 1958 (2013), the Court held that an arrestee may be subjected to a specific type of warrantless search – a buccal swab – without any modicum of suspicion. Central to the Court's rationale was its belief that the search – "wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells" constituted a "negligible" intrusion. *Id.* at 1967-68; 1969. Obviously, the same cannot be said of a search of a person's clothing, car or home. Particularly if that search constituted, like the one here, repeated grabbing, squeezing, and manipulating of an individual's testicles and other anatomy.

Also important to the Court's holding in *King* was that: "DNA collection is not subject to the judgment of officers whose perspective might be colored by their primary involvement in the often competitive enterprise of ferreting out crime." *Id.* at 1970 (internal quotation marks omitted). The Court was persuaded by the "standardized nature of the tests and the minimal discretion vested in those charged with administering the program" such that "there are virtually no facts for a neutral magistrate to evaluate." *Id.* By comparison, the *imposition* of a random search condition is entirely at the discretion of the bail commissioner and the *execution* of the random search bail condition is entirely at the discretion of law enforcement officers who are, as the U.S. Supreme Court has long held, not at all impartial. *Id.* (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

The Court was comfortable in its holding in large part because of the "not significant" intrusion of a buccal swab. *Id* at 1976. After all, all the government obtained from such a search, the Court reasoned, was a suspect's identity – something law enforcement had a significant interest in learning. *Id.* At 1971. And arrestees in *police custody* at the station further have diminished expectations of privacy in their person or in even something as limited as their identity. *Id.* at 1978. Of course, random search bail conditions have no such inherent limits; they authorize wholesale and

repeated searches of virtually anywhere an individual on bail happens to be at any time regardless of whether he or she is in police custody.

Finally, the Court was convinced that DNA collection was necessary to further the legitimate government interest in *inter alia*, ensuring that persons accused of crimes are available for trials. *Id.* 1970-72. To the contrary, there is no correlation, except maybe a negative one, to a random search condition and furthering the governmental interest in ensuring availability for trial. But even assuming *arguendo* that a random search condition *did* correlate to courtroom presence, *King* makes clear that: "The government interest must outweigh the degree to which the search invades an individual's legitimate expectation of privacy." *Id.* at 1977-78. The buccal swab search was justified because the defendant was already in custody (and persons expect reduced privacy during routine booking procedures) and because the intrusion was minimal. *Id.* at 1979. The same cannot be said for random search conditions imposed on a car passenger at the side of the road.

In *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court considered the modicum of proof required to search probationers – again, it bears repeating, individuals who have been convicted of a crime. The government argued that probationers consented to such searches as a condition of their probation. Importantly, the Court declined to address the consent rationale, although it did reason that the defendant's signature on a form purporting to authorize searches without a warrant or "reasonable cause" as a condition of probation, reduced his expectation of privacy. *Id.* at 118-20. The Court ultimately concluded, however, that a defendant's status post-conviction gives rise to a reduced expectation in privacy – distinguishable from defendants in a pre-trial posture and presumed innocent.

In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Supreme Court invalidated a state hospital's practice of testing pregnant women for cocaine and providing the results to the police. The Court considered the government's argument that the "ultimate purpose" of the testing

program was the "beneficent" goal of "protecting the health of both mother and child," but nonetheless concluded that "the purpose actually served . . . is ultimately indistinguishable from the general interest in crime control." *Id.* at 81. As such, the "programmatic purposes" for the search could not be justified by the special needs exception to the warrant requirement. *Id.* The Court reiterated that the government's interest in preventing crime by anyone is legitimate and compelling, but crime prevention is the quintessential general law enforcement purpose and therefore is the exact opposite of a special need. It is difficult to see how this reasoning is any different for individuals facing random search conditions as part of their bail.

The Ninth Circuit decided *United States v. Scott*, 450 F.3d 863 (9th Cir. 2006). The *Scott* court held that warrantless searches, including drug testing, imposed as a condition of pretrial release, required a showing of probable cause, even with a defendant's pre-release consent.[9]

The defendant in *Scott* was arrested on state charges of drug possession and released on his own recognizance. In order to qualify for release, he was required to sign a form stating that he agreed to comply with certain conditions, including "random" drug testing "anytime of the day or night by any peace officer without a warrant" and to having his home searched for drugs "by any peace officer anytime, day or night, without a warrant." *Id.* at 878. There was no evidence that the conditions were the result of findings made after any sort of hearing; rather, the conditions were merely "checked off by a judge from a standard list of pretrial release conditions." Based on an informant's tip (which the government conceded did not establish probable cause), state officers

---

[9] *See also State v. Ullring*, 1999 ME 183, 741 A.2d 1065 (holding warrantless search conditions may be imposed on a pretrial releasee so long as those conditions are reasonable). Notably, however, in the very first footnote in *Scott,* the court noted that it was unclear if *Ullring* "would come out the same way today," as it was decided before *United States v. Knights*, 534 U.S. 112 (2001) and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). *Scott*, 450 F.3d 863 n. 1. *See also United States v. Gauthier*, 09-CR-35-PS, 2010 WL 3488665 (D. Me August 30, 2010)(distinguishing *Gauthier* defendant from *Scott* because *Gauthier* Defendant had bail conditions that required him to provide a urine sample at a sheriff's office and not a home, where the *Scott* court had noted privacy implications are at their zenith, and noting Maine Bail Code sets forth factors that might be sufficient to satisfy *Scott* in any event).

went to the defendant's house and administered a urine test. When the defendant tested positive for methamphetamine, the officers arrested him and searched his house. The search turned up a shotgun, which defendant moved to suppress.

The Ninth Circuit began its analysis by citing *United States v. Salerno*, 481 U.S. 739 (1987), for the notion that the government could impose conditions, such as reasonable bail, as a condition of pre-trial release. The court observed that "[m]any pretrial detainees willingly consent to such conditions, preferring to give up some rights in order to sleep in their own beds while awaiting trial." *Id.* at 865-866. However, the court admonished:

> The 'unconstitutional conditions' doctrine . . . limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary. . . Giving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and gradually eroding constitutional protections. Where a constitutional right functions to preserve spheres of autonomy . . . unconstitutional conditions doctrine protects that sphere by preventing governmental end-runs around the barriers to direct commands.

*Id.* at 866 (citations omitted).

In the Fourth Amendment context: "Pervasively imposing an intrusive search regime as the price of pretrial release, just like imposing such a regime outright, can contribute to the downward ratchet of privacy expectations. While government may sometimes condition benefits on waiver of Fourth Amendment rights – for instance, when dealing with contractors, or paying welfare benefits – its power to do so is not unlimited." *Id.* at 867-68. Reducing the inquiry to one of reasonableness – the standard by which every Fourth Amendment search is evaluated -- the Ninth Circuit reasoned that the defendant's "consent to any search is only valid if the search in question (taking the fact of consent into account) was reasonable." *Id.* at 868.

The government argued that searching pre-trial releasees by testing them for drugs served two special needs: (1) protecting the community from criminal defendants released pending trial and (2) ensuring that defendants show up at trial. *Id.* at 869. The court rejected the first rationale, noting

17

that protection of the public from criminal activity is the paradigmatic example of when the special needs exception *does not* apply. *Id.* at 872.

As for the second rationale, the court noted it might justify a special-needs search, but concluded that "the connection between the object of the test (drug use) and the harm to be avoided (non-appearance in court) is tenuous." *Id.* at 870. The Ninth Circuit reiterated: "The Supreme Court has criticized assertions of special needs based on 'hypothetical' hazards that are unsupported by 'any indication of a concrete danger demanding departure from the Fourth Amendment's main rule.'" *Id.* (citing *Chandler v. Miller*, 520 U.S. 305, 319 (1997)). The court further explained: "We are especially reluctant to indulge the claimed special need…because [the defendant's] privacy interest in his home, where the officers came to demand the urine sample, is at its zenith." *Id.* at 871 (collecting cases rejecting the special needs exception as applied to the home). Thus, "to the extent that [the defendant's] assent [to a search by signing the pre-trial release agreement] decreased his expectation of privacy, we hold that the decrease was insufficient to eliminate his expectation of privacy in the home." *Id.* at 872.[10]

As for *Salerno*, the Ninth Circuit explained that, despite the presumption of innocence, the U.S. Supreme Court has held that a criminal defendant might be detained pretrial – but only following a "full-blown adversary hearing, [during which] the Government must convince a neutral decision-maker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* at 874 (citing *Salerno*, 481 U.S. at 750)). In other words, the Court "upheld the constitutionality of a bail system where pretrial detainees could be

---

[10] The *Scott* Court easily distinguished its opinion from *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987), where the U.S. Supreme Court upheld the warrantless search of the probationer's home. *See Scott*, 450 F.3d at 872. The Court simply acknowledged the obvious -- that "pre-trial releasees are not probationers" – and further explained how the Supreme Court relied on this logic in *Ferguson*: "*Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy at large" and that "[p]eople released pending trial, by contrast, have suffered no judicial abridgment of their constitutional rights." *Id.*

18

detained only if the need to detain them was demonstrated on an individualized basis. The arrest alone did not establish dangerousness; it merely triggered the ability to hold a hearing during which such a determination might be made. It follows that if a defendant is to be released subject to bail conditions that will help the community from the risk of crimes he might commit while on bail, the conditions must be justified by a showing that defendant poses a heightened risk of misbehaving while on bail.  The government cannot, as it is trying to do…, short-circuit the process by claiming that the arrest itself is sufficient to establish that the conditions are required."[11]

Even if the search based on bail conditions is not per se unconstitutional, the facts taken together did not create probable cause that Berhe was engaged in illegal activity. *See United States v. Garcia*, 23 F.3d 1331, 1335 (8th Cir. 1994) (after initial stop had ended, officer learned that passenger had been arrested for a firearms violation; second stop violated the Fourth Amendment because subsequent information about arrest did not create reasonable suspicion).

### iii. No Exigent Circumstances Existed to Permit the Warrantless Search of Mr. Berhe

As the Court knows well, a warrantless search or seizure is "per se unreasonable[ ] unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971). "To show exigent circumstances, the police must reasonably believe that there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *See United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005) (quotation marks omitted). Proof of exigent circumstances must be supported by "particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects" *Id.* (quotation marks omitted). Simply put, there

---

[11] *But see Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695 (6th Cir. 2011) (concluding that pretrial releasee had reduced expectation of privacy because he "agreed to random drug testing as a condition of his pretrial release" and because he participated "in the highly government controlled and regulated" pretrial release program").

was no exigency here that necessitated law enforcement officers searching Mr. Berhe without a warrant.

### D. All Evidence that Came After the Illegal Search of Mr. Berhe must be Excluded as Fruits of the Poisonous Tree

Sergeant Pappas's removal of Mr. Berhe and then search of a handcuffed Mr. Berhe unambiguously violated the Fourth Amendment, and everything that followed in sequence of events is a non-attenuated fruit of that antecedent illegality (*e.g.* the traffic stop, the traffic stop's unlawful extension, the removal, and/or the search). *See e.g. Nardone v. United States*, 308 U.S. 338, 341 (1939) (the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree."); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (the exclusionary rule "extends as well to the indirect as the direct products" of unconstitutional conduct).

## V.   CONCLUSION

As explained above, the search in this matter was illegal from the moment Sergeant Pappas stopped the vehicle, to him forcing the Defendant out of the vehicle, and to the final intrusive search of the Defendant in handcuffs. For this reason, the Court must suppress the evidence obtained therefrom.

Dated: February 15, 2019

/s/ Stacey D. Neumann
Stacey D. Neumann, Esq.
sneumann@mpmlaw.com
MURRAY PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207)773-5651
(207) 773-8023 (Fax)
*Attorney for MeKonnen Berhe*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed this *Motion to Suppress* with the Clerk of

Court using the CM/ECF System which will send notice of such filing to all parties of record.  This

document is available for viewing and downloading from the CM/ECF System.


Dated: February 15, 2019                    /s/ Stacey D. Neumann

                                            Stacey D. Neumann, Esq.
                                            sneumann@mpmlaw.com
                                            MURRAY PLUMB & MURRAY
                                            75 Pearl Street, P.O. Box 9785
                                            Portland, ME  04104-5085
                                            (207)773-5651
                                            (207) 773-8023 (Fax)